In the Matter of the Petition for the Revocation of Letters of Administration Granted to CLARA WALLACE, Appellant, upon the Estate of MAX AUERBACH, Deceased.

FANNIE AUERBACH and Another, Respondents.

First Department, February 21, 1924.

Husband and wife — proceeding in Surrogate's Court to revoke letters of administration issued to sister of deceased — petitioner claims to have been common-law wife of deceased — decree revoking letters on ground that petitioner was common-law wife reversed as against weight of evidence.

A decree of a Surrogate's Court revoking letters of administration issued to a sister of a deceased man, made upon the ground that the petitioner in the proceeding for such revocation was the common-law wife of the deceased, must be reversed as against the weight of evidence, where it appears that the surrogate did not base his decision upon any direct evidence of the making of the alleged common-law marriage contract and the evidence that the deceased and the petitioner held themselves out to the world as husband and wife was of very doubtful character and was entirely offset by the evidence of their general conduct which disclosed a decided repugnance to a legalized marital state.

APPEAL by Clara Wallace from a decree of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 12th day of April, 1923, finding that the

deceased had a common-law widow, and revoking the letters of administration granted to the appellant, a sister of deceased.

*Abraham Rickman*, for the appellant.

*J. Edward Quinn* [*William A. Sawyer* of counsel], for the petitioner, respondent.

*John F. Collins*, special guardian, for the respondent William Auerbach.

McAvoy, J.:

The surrogate revoked the letters of administration granted to appellant here, who is a sister of the intestate, and finds that the decedent left a widow whose wifehood was constituted through a common-law marriage.

The appellant, Clara Wallace, claims to be the sole surviving next of kin of the decedent, and applied for and received letters of administration upon his estate. The decedent was a druggist and conducted a drug store for many years in Manhattan; he was struck by a vehicle while crossing a street in New York city, and died intestate. After the appointment of respondent as administratrix, the petitioner herein, who is denominated in her papers Fannie Auerbach, commenced this proceeding to have the letters issued to Clara Wallace revoked, claiming that she was the widow of the decedent by reason of a common-law marriage existing between them, and that her son William was a legitimate child of that union.

The alleged common-law marriage is claimed to have taken place in December, 1913, in New York city where all the friends and nearly all the relatives of decedent resided, and the alleged child of the decedent is claimed to have been born in New York city in December, 1914. Max Auerbach died in November, 1922, but up to that period none of the relatives or friends of the decedent ever heard of the petitioner or her child, nor were they aware of her claim until the institution of this proceeding. The petitioner was known under at least three names. She admits never using the name Auerbach until a few months before the death of decedent. She admits she was the mother of at least one other illegitimate child, the father of whom was named Rosono. No relative of her own appeared as a witness, who ever heard of her marriage to decedent.

The alleged legitimate son of the decedent herein and the concededly illegitimate child of Rosono were both taken from her custody by the Children's Court of the city of New York in 1920, about two years before Auerbach was killed, by reason of improper guardianship of the claimant herein, the mother of said two children. This episode was within the knowledge of the decedent. A witness called to support the alleged claim of the petitioner herein admitted

that he had been convicted of maintaining a house of prostitution at Coney Island at about the very time when it is alleged claimant and her son and decedent made his acquaintance and hired a room from him at Coney Island.   At the time of the birth of the alleged legitimate son of the decedent in a charity ward in the Sloane Maternity Hospital, the child had been given, by the mother, a name entirely different from that of the decedent, to wit, Lindner.   The father of said child was then described by the petitioner herein as being in a line of business utterly foreign to that conducted by the decedent. When the proceedings in the Children's Court were had, resulting in the custody of the two children being taken from the petitioner herein, she called herself by another name, and at that time testified that she was single.   She testified then that the decedent was also single, and that he was having sexual intercourse with her and was helping to support her.   The probation officer and stenographer of the Children's Court testified that the petitioner herein, when he interviewed her after the hearing, denied that the decedent was her husband and stated that both of said children were illegitimate. The child himself, called as a witness, testified that he had been known under the name of one of the aliases used by his mother, and that he had recently been told that he should call himself by the name of the decedent.   On every occasion prior to the institution of these very proceedings both the decedent and the petitioner had denied the existence of any marital relationship between themselves.   The decedent while living was questioned by a representative of the orphan asylum where the child was committed by the Children's Court concerning his relationship to the said child, and the decedent refused to acknowledge that the child was his illegitimate son.

The claim of the respondent was that the common-law marriage was contracted at 66 West Ninth street, Manhattan, New York city, in or about the latter part of December, 1913.   No direct evidence was offered by any witness to prove the making of this marriage contract at the time specified, excepting that of the petitioner herself who testified, under objection and exception, as to her dealings with the decedent at said place at or about said time.

The learned surrogate says in his opinion that he has entirely disregarded this testimony in coming to his conclusion.   Consequently there is not in the record any evidence upon which the surrogate based his finding as to the making of this marriage contract, excepting by way of inferences arising from the testimony of other witnesses, none of whom testified to the making of any such contract at said time.

The other evidence as to the earliest time when it is claimed

that the petitioner and the decedent are supposed to have presented themselves to the community as man and wife concerns itself with May, 1917, and this testimony was given by the witness Jacob Sandin, the person who kept the hotel at Coney Island. There is an utter absence of any proof given by either this witness or any of the other witnesses tending to show the existence of any such relationship earlier than 1917.

The witness Sandin testified that in May, 1917, the deceased asked him for a room for his wife and little child, and that the decedent referred to the petitioner herein as his wife, and the child called the decedent " Papa," and these people remained at his place for six weeks. He testified further that the following year, 1918, they came again and remained eight weeks; that the decedent paid the board for all and called the petitioner his wife.

In the bill of particulars it is claimed that the child was born on December 15, 1914. Consequently in the summer of 1918 he was approximately three and a half years old. This trial did not take place until February, 1923, almost five years after the time when this witness had last seen the infant of three and a half years of age. Notwithstanding this he claimed to be able to recognize and identify him. He testified that he never knew the petitioner before she came to his place and claimed that she and the decedent registered, but that he threw away the register. He testified that his business was renting furnished rooms at 1305 Surf avenue, Coney Island, to any persons coming there who told him that they were husband and wife, and had baggage. He admitted that on June 23, 1918, he was convicted in the Court of Special Sessions, Brooklyn, of maintaining a house of prostitution, which he had conducted at Coney Island, called the West End House. He denied that he was in the same business at the time of the trial. He said in his testimony that the West End House, that he was convicted of maintaining, was at Surf avenue and Twelfth street, but that the house at which petitioner and decedent stopped in the summer of 1917 was elsewhere in Coney Island. This West End House was maintained by him after the time when the parties boarded with him; and he asserted that he had not operated the West End House in 1918. He began to operate it, he said, two years before the trial (which would mean 1921); and he attempted to evade the effect of the cross-examination after his attention was fixed to the fact that his conviction was in June, 1918.

Sandin's description of the alleged husband of the petitioner was: Height, five feet one or two inches. No whiskers. No moustache. Weight, one hundred and forty-five pounds. Apparent age, thirty-eight or thirty-seven. This witness could not remember

the name of any other person or family who stopped in the fifteen rooms which he rented to numbers of people, some for a week and some for longer, but could remember only the name of Auerbach. The witness admitted that he continued to run the West End House for four years after his conviction, and knew the name of the person who was running it at the time of this trial.

Anna Mason testified that she had lived at 3315 Broadway (the place at which the petitioner resided for a number of years prior to the time of the death of decedent) for about five years; that she knew the petitioner and had known her four years; that she knew the decedent, had seen him several times and met him in the petitioner's apartment which was underneath her own, and heard him refer to the petitioner as his wife; that the deceased called the boy his son.  Miss Mason further testified that during the four years that the petitioner lived in this house at 3315 Broadway, petitioner had the name Mondell on her door bell. and that the name Auerbach was on the door bell more than a couple of weeks, but she did not know how many weeks; that when petitioner moved in, the name on her bell was Mondell; that when witness first met petitioner, she called herself Mrs. Mondell; that the petitioner afterwards told her that her name was Auerbach, but when she told her this she could not remember; that she did not ask petitioner why she used the name of Mondell if her name was Auerbach, because she did not think it strange; that she had never seen Mr. Mondell, but another man lived in the petitioner's apartment; and that there was not more than one man living there at the time of the trial; and that there might have been two living there at some time; that she, the witness, knew of the occasion when petitioner's child was taken away by the Children's Court, but had never spoken to Auerbach, the decedent and supposed father of the child, concerning the same, nor to the petitioner, because she did not consider it any of her business, notwithstanding that Auerbach continued to come around to 3315 Broadway. Although witness visited in the apartment of petitioner and saw decedent there, she never saw any of his friends or relatives there and never met any of them.

The other witnesses to declarations by the decedent of his marital status are casuals who either visited petitioner, kept boarding houses where she stayed, or met her in connection with inquiries instituted by the Hebrew Orphan Asylum.  They do not increase the fact value of the proof any more than to show that to the immediate observers of their state of life these parties intended to maintain a semblance of outward order and decency by failing to proclaim a meretricious state or a relation of concubinage.

These proofs are unavailing against the history of the parties' lives as they have written it themselves. Nowhere in any aspect of that history does anything appear but a repugnance to a legalized marital state and a determination to maintain the status of a single person, at least on the part of the man. Nor was the woman deceived into the belief that she was married. She was not inexperienced. She had another illegitimate child and knew the consequences of her free life.

The determination is against the evidence, and the decree should be reversed, with costs to the appellant against the petitioner and with costs to the special guardian, payable out of the estate, and the petition denied, with costs against the petitioner to the administratrix.

CLARKE, P. J., DOWLING, FINCH and MARTIN, JJ., concur.

Decree reversed, with costs to appellant against the petitioner, and with costs to the special guardian payable out of the estate, and the petition denied, with costs against the petitioner to the administratrix. Settle order on notice.